UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

----oo0oo----

E-SMART TECHNOLOGIES, INC., a Nevada Corporation, and IVI SMART TECHNOLOGIES INC., a Delaware Corporation,

Plaintiffs,

v.

WAYNE DRIZIN, MICHAEL GARDINER, ELECTRONIC PLASTICS CORPORATION, and A CARD COMPANY,

Defendants.
_______________________________/

NO. CIV. 3:06-05528 MHP

MEMORANDUM AND ORDER RE: CIVIL CONTEMPT

----oo0oo----

Plaintiffs e-Smart Technologies, Inc. ("e-Smart") and IVI Smart Technologies Inc.[1] initiated this action in 2006 against defendants Wayne Drizin, Michael Gardiner, Electronic

[1] Although IVI Smart Technologies Inc. is affiliated with e-Smart and did not have independent representatives at the settlement conference, the Order to Show Cause giving rise to the civil contempt hearing was limited to e-Smart and its representatives, thus the court's decision is limited to e-Smart.

Plastics Corporation, and A Card Company, alleging that defendants stole trade secrets in plaintiffs' biometric smart cards.[2] In the fifth settlement conference held in this matter, a smart card Gardiner brought to the settlement conference disappeared, resulting in civil contempt charges against e-Smart and four of its representatives.

I. Factual and Procedural Background

The settlement conference at issue was held on August 12, 2010, before Magistrate Judge Zimmerman and lasted the entire day. The attendees at the settlement conference included Mary Grace (e-Smart's Chief Executive Officer), Tamio Saito (e-Smart's Chief Technology Officer), Marcello Soliven (e-Smart's Director of Wireless Research and Development), Ananth Krishnan (research engineer for e-Smart) (referred to collectively as "e-Smart representatives"), Christopher Lilly (plaintiffs' counsel), Drizin, Gardiner, and Magistrate Judge Zimmerman's student extern. When the settlement conference began, the attendees were seated around the conference table in Magistrate Judge Zimmerman's library. Upon concluding that a joint session would not be productive, Magistrate Judge Zimmerman broke the parties up, bringing Gardiner and Drizin into his personal chambers and having plaintiffs' counsel and representatives remain in the library.

---

[2] Put simply, the biometric smart cards at issue in this dispute are credit-card-sized cards used for identification purposes that have the capability of reading and confirming the user's fingerprint. Although plaintiffs and other companies have allegedly been producing these cards for quite some time, not a single card has been sold in the United States, according to Drizin.

When Gardiner and Drizin were alone with Magistrate Judge Zimmerman in his chambers, Gardiner produced a biometric smart card that had a picture of George Washington on it and was manufactured by Fidelica, a company that is not involved in this lawsuit. According to Gardiner, the Fidelica card was a significant piece of evidence because it contained the very trade secrets that defendants had allegedly stolen from plaintiffs and thus provided evidence that e-Smart's card did not contain trade secrets. Magistrate Judge Zimmerman took the Fidelica card to e-Smart's representatives in the library, explained defendants' position about the card's value in the settlement process, and showed the representatives the card. Grace and Saito examined the card, and the last time Magistrate Judge Zimmerman saw the card, it was in Saito's hand. At the end of the settlement conference, Gardiner indicated that the card had not been returned to him, at which time he accompanied Magistrate Judge Zimmerman to the library and Magistrate Judge Zimmerman instructed everyone present to search their personal effects for the card.

Magistrate Judge Zimmerman attempted to have a marshal come search the attendees for the card; however, the United States Marshal's Office persuaded him not to conduct a search because the female marshal who would need to search Grace had left for the day and could take about one hour to return. Magistrate Judge Zimmerman thus concluded the conference and requested the parties to search for the card again that evening. The following day, Magistrate Judge Zimmerman issued a sealed order requiring the e-Smart representatives to make every effort

to locate the card and allowing them to return it anonymously to the court by August 20, 2010. (Docket No. 324.)

When the Fidelica card was not returned by August 20, 2010, Magistrate Judge Zimmerman certified his version of the facts pursuant to 28 U.S.C. § 636(e) to Judge Patel as constituting civil contempt, stating that he "has reason to believe e-Smart, through one or more of its representatives, still has the missing card, or disposed of it, to prevent it from being used as evidence by defendants." (Docket No. 328.) Judge Patel subsequently issued an Order to Show Cause against e-Smart and its representatives, requiring them to "show cause why you should not be adjudged guilty of criminal and/or liable for civil contempt and this action be dismissed with prejudice." (Docket No. 329.) E-Smart responded to the Order to Show Cause and included declarations by its representatives denying that they took the Fidelica card and giving their version of the events leading up to the disappearance of the card. After the United States Attorney's Office declined to initiate criminal contempt charges, Judge Patel appointed Stephen E. Taylor and Jonathan A. Patchen of the Taylor & Company Law Offices, LLP, to prosecute the civil contempt charges.

Because Magistrate Judge Zimmerman would serve as a key witness in the civil contempt hearing, the undersigned, a judge from outside of the district, was assigned to preside over the contempt hearing. After conducting a four-day evidentiary hearing, the court finds e-Smart in civil contempt. This Memorandum constitutes the court's findings of fact and conclusions of law.

II. Discussion

A court's power of contempt is regarded as an "inherent" power that is "necessary to the exercise of all others." Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 831 (1994). "A district court has the power to adjudge in civil contempt any person who [] disobeys a specific and definite order of the court." Gifford v. Heckler, 741 F.2d 263, 265 (9th Cir. 1984). "Intent is not an issue in civil contempt proceedings. The sole question is whether a party complied with the district court's order." Donovan v. Mazzola, 716 F.2d 1226, 1240 (9th Cir. 1983) (internal citations omitted).

"Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." United States v. United Mine Workers of Am., 330 U.S. 258, 303-04 (1947); accord United States v. Bright, 596 F.3d 683, 695-96 (9th Cir. 2010) ("Civil contempt is characterized by the court's desire to compel obedience to a court order or to compensate the contemnor's adversary for the injuries which result from the noncompliance." (quoting Falstaff Brewing Corp. v. Miller Brewing Co., 702 F.2d 770, 778 (9th Cir. 1983))) (internal quotation marks omitted).

"The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court." In re Bennett, 298 F.3d 1059, 1069 (9th Cir. 2002). The clear and convincing evidence standard

requires the moving party to "place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.'" Colorado v. New Mexico, 467 U.S. 310, 316 (1984). Factual contentions are highly probable if the evidence offered in support of them "instantly tilt[s] the evidentiary scales in the affirmative when weighed against the evidence [the non-moving party] offered in opposition." Id.

A. Determining Who Took the Fidelica Card

Based on the evidence presented at the hearing, the court finds, by clear and convincing evidence, that the Fidelica card was taken by one of the e-Smart representatives at the conference because only they had the opportunity to take the card. Further, of the e-Smart representatives, the court is convinced Mary Grace took the card based on her lack of credible and consistent testimony about the events that day and the evidence revealing her motive to take it.[3]

Magistrate Judge Zimmerman credibly testified[4] that, after Gardiner produced the e-Smart card in his chambers, he went to the library without Gardiner or Drizin to show the e-Smart representatives the Fidelica card. After giving the card to the e-Smart representatives, Magistrate Judge Zimmerman testified that he last saw the card in Saito's hand and the e-Smart

---

[3] As credibility was a central issue at the hearing, the character of the e-Smart representatives, Gardiner, and Drizin was relevant and considered by the court. The court did not, however, consider or rely on any of the exhibits defendants submitted after Grace's testimony, which are filed as Docket Numbers 368 to 374.

[4] The court finds Magistrate Judge Zimmerman's testimony credible on all material issues and accepts his testimony as the most accurate account of the relevant events.

representatives testified that the card was placed on the library table when they finished examining it. Thus, it is undisputed that the card remained in the library after Magistrate Judge Zimmerman showed it to the e-Smart representatives. Although there is conflicting testimony about when and for how long Gardiner and Drizin returned to the library during the remainder of the settlement discussions, all of the parties agree that every time Gardiner and Drizin returned to the library, they were accompanied by Magistrate Judge Zimmerman. The e-Smart representatives were thus the only individuals left in the library alone with the card and therefore the only individuals who had the opportunity to take the card outside the presence of Magistrate Judge Zimmerman.

E-Smart has attempted to suggest that, even though only its representatives had access to the card in the library, Gardiner and Drizin snuck into the library to take the card after the e-Smart representatives left for lunch. In their declarations and at the hearing, the e-Smart representatives state that the Fidelica card was on the conference table in the library when they left for lunch and gone when they returned from lunch. Significantly, however, this explanation was never mentioned to Magistrate Judge Zimmerman when everyone was looking for the card at the close of the settlement conference and was raised for the first time in the declarations. Magistrate Judge Zimmerman’s judicial assistant also credibly testified that she escorted Gardiner and Drizin out of chambers during the lunch break, which would have precluded them from sneaking into the library to take the Fidelica card.

E-Smart has also tried to suggest that, based primarily on their prior felony convictions, Gardiner's and Drizin's character makes it just as likely that they took the card. While the court did not find Drizin to be a credible witness and finds him, like Grace, to display the typical characteristics of a con-artist, none of the evidence creates a plausible scenario under which Drizin had the motive or opportunity to take the Fidelica card.

As for Gardiner, not only did he lack the opportunity to take the Fidelica card, but the court finds it is even less plausible that he would take the very card he brought to the settlement conference in the hopes of getting plaintiffs in trouble. Although Gardiner has been convicted of a felony, the court does not believe his prior misconduct paints him to be of as bad character as e-Smart suggests. While he was convicted for fraud, his sentence included only a $10,000.00 fine and three years probation and he cooperated with the government. The court has the impression that Gardiner tends to be gullible to fraudulent schemes, and the court therefore is inclined to believe that he was himself a victim as well as a perpetrator in that case.

The only other individuals who had access to the library were Magistrate Judge Zimmerman's staff, which included his judicial assistant and a student extern who accompanied him for part of the settlement conference. The record is devoid of any evidence suggesting even a remote possibility that these

individuals took the e-Smart card.[5]

Accordingly, the e-Smart representatives were the only individuals with the opportunity to take the card and, of the e-Smart representatives, the evidence persuades the court that Grace was the one who took the card. In contrast to Magistrate Judge Zimmerman's credible testimony about what occurred when he originally introduced the card, Grace's testimony about the events was amorphous and appeared to develop as she testified. For example, when questioned about the technology on the Fidelica card, Grace capriciously interjected that she actually asked Magistrate Judge Zimmerman to hold onto the card:

> I said, why in the world would he [(Gardiner)]--in fact, I said to the Judge, I said, "Judge would you hold this card? Would you hold this card with the special master in the court, so" . . . "we can prove this is stolen, our stolen technology. Not just on the ID Smart cards, but now on the Fidelica cards that they had the audacity to bring into court."

(Apr. 20, 2011, Tr. 59:2-9.) Not only was this answer--along with a majority of Grace's testimony--non-responsive to the actual question, Grace's testimony that she asked Magistrate Judge Zimmerman to hold onto the Fidelica card was not corroborated by any other witness and was absent from her original declaration filed in response to Judge Patel's Order to Show Cause.

Grace also testified that, when the Fidelica card was presented, Gardiner indicated that he knew the technology on it

---

[5] Magistrate Judge Zimmerman's testimony about contacting the Marshal's Office indicates his law clerk was in chambers later that day. Nothing in the testimony suggests--nor can this court surmise--any reason why the law clerk, or any other court employee, would have taken the card.

was stolen from e-Smart and that he had previously prepared an affidavit to that effect. Similar to her new testimony about asking Magistrate Judge Zimmerman to hold onto the card, any suggestion that Gardiner had prepared such an affidavit is absent from any of the e-Smart representatives' declarations. Although Grace testified that some of the testimony missing from her declaration was in her notes and that e-Smart's attorney failed to include it, she neither produced her notes nor denied that she reviewed her declaration before signing it. As this declaration was prepared in response to the Order to Show Cause, the importance of her account of what happened was clear. The absence of such significant testimony from her declaration and her addition of it for the first time at the hearing leaves the court firmly convinced that Grace is developing an ever-changing story to cover up for her misconduct in taking the Fidelica card.

With respect to her motive to take the card, the court finds it highly probable that Grace was simply taking back what she, in her way of perceiving things, believed belonged to e-Smart. Magistrate Judge Zimmerman testified that when he initially presented the card to the e-Smart representatives, Grace "sort of did a -- like, a double-take, you know," giving him the impression that she thought defendants had "found something." (Apr. 7, 2011, Tr. 57:2-4.) Grace also testified that the Fidelica card had e-Smart's "stolen technology," (Apr. 20, 2011, Tr. 49:9), and told Magistrate Judge Zimmerman that Fidelica "was another company that has stolen our trade secrets." (Apr. 7, 2011, Tr. 57:9-10.) Grace further testified that she believed the Fidelica card Gardiner produced at the settlement

conference "was stolen from us, from e-Smart, and brought into the conference." (Apr. 20, 2011, Tr. 66:4-7.) Grace's reaction to the card and purported belief that it was stolen from e-Smart and contained e-Smart's stolen technology, along with her demeanor throughout her testimony and obvious animosity toward Gardiner and Drizin,[6] convinces the court that Grace felt justified in simply taking back what she asserted belonged to her company.

Grace's testimony and demeanor also persuade the court that she has skated through her various ventures as a flim-flam

---

[6] Throughout her testimony, Grace constantly tried to slip in negative comments about Gardiner and Drizin, making her disdain for them anything but discreet. The following is one example:

> [MR. PATCHEN]: My question is: If the Fidelica card was not using the trade secrets of e-Smart, then you would have no objection to Mr. Gardiner producing a card that was like Fidelica.
> A: I can't answer that question. Because, like Mr. Satio explained, I'm not qualified to answer what card has what on it.
> I would have to ask experts if this card in any way -- it has been derived from our technology, has been -- these are all ex-employees. These people -- have you ever seen their entire background?
> Q: My question for you, Ms. Grace --
> A: Okay. Their entire background that we're -- it includes owning a brothel by -- there was a book written last year called "The Man who Took America to War" that said he --
> THE COURT: Don't get into it --
> THE WITNESS: -- laundered money for the Mafia, and he --
> MR. PATCHEN: Your honor, move to strike.
> THE WITNESS: I mean, these people are -- he's defrauded so many of our investors and shareholders that we can bring in here that he would --
> THE COURT: Wait, don't --
> THE WITNESS: He would guarantee them he would give them triple their money back. And then -- . . . .

(Apr. 20, 2011, Tr. 62:10-23.)

artist who fabricates information in an attempt to extort a profit. For example, when asked why e-Smart had not filed its required "10-K" Securities and Exchange Commission filings since 2007, Grace first evaded the question and, when the court repeated the question, she could not give a consistent or clear answer:

> Well, we filed it -- we have not filed it, on the advice of counsel. And, we will be preparing it. But, we are looking at different reorganization -- I mean, restructuring of the company. And on advice of counsel, we will do it. We have -- you know, we have informed our attorneys. I -- I act on advice of counsel, but -- and, it will be. I mean, we are in the process of trying to get the 10-Ks filed.

(Id. at 92-93:5.) Grace also repeatedly evaded questions by resorting to an explanation that e-Smart has six hundred shareholders and her utmost concern is for those shareholders. The court was unpersuaded, however, that e-Smart is anything more than a sham company or that Grace's concern for its shareholders extends beyond the financial gain they bring her.

Based on her demeanor testifying and conduct during the settlement process of this case, the court is also convinced that Grace views the judicial process as a mere tool to conduct business rather than an avenue to resolve disputes. Magistrate Judge Zimmerman, who spent more hours attempting to settle this case than in any other case, testified that he was under the impression that Grace was not negotiating in good faith during the settlement process. When discussing a separate case against Gardiner and Drizin with a colleague, Grace's comment about her strategy also reflects her use of litigation as an improper business tool: "I believe if we can put the pressure of a second

lawsuit on both Gardiner and Drizin, that we can resolve both suits exponentially [sic].” (Defs.’ Ex. Y.)

The testimony of the other e-Smart representatives does not create any reason to doubt that Grace took the card. The court did not find Soliven to be a credible witness and does not believe his testimony that Gardiner and Drizin left belongings close to the card and, after the e-Smart representatives returned from lunch, that the card and belongings on the table were gone. Krishnan did not appear to have an independent recollection of the details of what occurred that day and appeared to simply agree with the general story advanced by his colleagues. Lastly, based on his defensive and argumentative demeanor throughout his testimony, the court finds it highly probable that, even though he did not take the Fidelica card, Saito would not disclose the fact that Grace took it if he was privy to that information.

Accordingly, when contrasted to the lack of any plausible scenario under which another individual took the Fidelica card, the evidence establishing that Grace had the opportunity and motive to take the card, along with her lack of credibility as witness, convinces the court that it is highly probable that Grace took the Fidelica card on August 12, 2010.

B. Determining Whether Civil Contempt Occured

Having found that Grace took the Fidelica card, the next question is whether the Special Prosecutor proved, by clear and convincing evidence, that her conduct “violated a specific and definite order of the court.” In re Bennett, 298 F.3d at 1069. Relying on United States v. McGainey, 37 F.3d 682 (D.C. Cir. 1992), the Special Prosecutor argues that e-Smart can be

held in civil contempt if Grace obstructed the administration of justice even if her conduct did not violate a specific court order.

In McGainey, the appellate court upheld McGainey's conviction for criminal contempt after he made a threatening gesture in the galley of a courtroom during a criminal trial. Id. at 685-86. His conviction for criminal contempt, however, was based on 18 U.S.C. § 401(1), which empowers the court to hold an individual in criminal contempt for "[m]isbehavior . . . in its presence or so near thereto as to obstruct the administration of justice." 18 U.S.C. § 401(1); see also McGainey, 37 F.3d at 684 (identifying the elements of criminal contempt as "misbehavior of a person, in or near to the presence of the court, which obstructs the administration of justice, and which is committed with the required degree of criminal intent"). For a criminal contempt conviction under § 401, courts have held that "[w]illfulness is an essential element." United States v. Laurins, 857 F.2d 529, 534 (9th Cir. 1988).

At first blush, McGainey appears easily distinguishable as it dealt with criminal, not civil, contempt and § 401 governs criminal, not civil, contempt. The Ninth Circuit, however, has repeatedly stated that § 401, although appearing in the criminal code, applies equally to civil contempt. See United States v. Powers, 629 F.2d 619, 624 (9th Cir. 1980) ("Title 18 U.S.C. §§ 401 and 402 provide federal courts statutory authority to punish contemptuous actions. Section 401 applies to both criminal and civil contempt and contains no limitation on the power of the district court to impose fine or imprisonment for a violation.");

United States v. Miller, 588 F.2d 1256, 1262 (9th Cir. 1978) (same); cf. Britton v. Co-op Banking Grp., 916 F.2d 1405, 1409 n.4 (9th Cir. 1990) (noting that a district court may impose civil contempt pursuant to 18 U.S.C. § 401(3), which provides for criminal contempt for "[d]isobedience or resistance to [the court's] lawful writ, process, order, rule, decree, or command").[7]

Despite indicating that § 401 provides authority for civil and criminal contempt, the Ninth Circuit has never held that obstruction of justice, without the violation of a specific court order, is sufficient to give rise to civil contempt. If the issue were to be properly raised before the Ninth Circuit, this court doubts that the Ninth Circuit would continue to rely on § 401 for civil contempt. Limiting application of § 401 to criminal contempt and relying on caselaw for the standards governing the court's inherent civil contempt power is also consistent with the Supreme Court's criminal and civil contempt decisions. See, e.g., Hutto v. Finney, 437 U.S. 678, 690-91 (1978) (citing § 401 as authority for criminal contempt and a

---

[7] Presumably, if § 401 could be relied on for civil contempt, the caselaw requiring the requisite level of intent for criminal contempt under § 401 would not apply to civil contempt. See McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949) ("Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance. Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act."); Perry v. O'Donnell, 759 F.2d 702, 705 (9th Cir. 1985) ("Although willfulness is a necessary element of criminal contempt, we find it significant that civil contempt may be established even though the failure to comply with the court order was unintentional."); United States v. Asay, 614 F.2d 655, 661 (9th Cir. 1980) ("Willfulness is not an element of civil contempt.").

prior Supreme Court decision as authority for civil contempt); Bagwell, 512 U.S. 821 (omitting any reference to § 401 in its lengthy discussion of civil contempt).

Relying on subsection 401(1) to find civil contempt absent a court order would also conflict with the unequivocal and long-standing precedent requiring disobedience of a court order for civil contempt. See Gifford, 741 F.2d at 265; In re Bennett, 298 F.3d at 1069; see also Labor/Comty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth., 564 F.3d 1115, 1123 (9th Cir. 2009) ("For issuance of a contempt order against MTA to be proper, BRU must establish (1) that [the contemnor] violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence.") (internal quotation marks omitted); Gates v. Shinn, 98 F.3d 463, 472 (9th Cir. 1996) ("Civil contempt is appropriate only when a party fails to comply with a court order that is both specific and definite.") (internal quotation marks omitted).

Not only does the precedent in this circuit state that civil contempt cannot occur absent disobedience of an order from the court, none of the parties cited and this court was unable to find a single Ninth Circuit case in which a party has been adjudged in civil contempt absent a court order. In an effort to be thorough, this court conducted a Westlaw search for every published Ninth Circuit decision that used the term "civil contempt." The search revealed 298 cases and the court's review of each of those cases confirmed that the Ninth Circuit has never addressed, in a published opinion, a district court's

adjudication of civil contempt absent disobedience of a court order giving rise to the contempt.[8]

Accordingly, in light of the clear precedent in this circuit and the absence of a single Ninth Circuit decision in which a contemnor was found in civil contempt absent disobedience of a court order, the court concludes that an individual can be found in civil contempt only for violation of a specific and definite court order, not for the obstruction of justice in the absence of a court order.

Because e-Smart cannot be held in civil contempt absent one of its representative's disobedience of a specific and definite order of the court, the court must determine whether Grace's conduct violated a court order. None of the parties contend that Magistrate Judge Zimmerman issued an order prohibiting taking the card, and thus Grace's theft of the card did not constitute civil contempt. When the Fidelica card was initially missing at the close of the settlement conference, Magistrate Judge Zimmerman instructed the parties to "conduct a really good search" because he "want[ed] the card found." (Apr. 7, 2011, Tr. 67:6-10.) Although it was clear that Magistrate Judge Zimmerman wanted the missing card returned immediately, his instructions to the e-Smart representatives did not clearly

---

[8] The brevity of four per curiam decisions prevents the court from determining whether an order gave rise to the civil contempts at issue in the appeals, but nothing suggests that orders were not issued in each of the cases. See Hughes v. Sharp, 476 F.2d 975 (9th Cir. 1973); Olsen v. United States, 446 F.2d 912 (9th Cir. 1971); Matter of Bowden, 444 F.2d 546 (9th Cir. 1971); Bd. of Governors of the Fed. Reserve Sys. v. Transamerica Corp. & Bank of Am., Nat'l Trust & Sav. Ass'n, 184 F.2d 326 (9th Cir. 1950).

constitute an order from the court. Most tellingly, Magistrate Judge Zimmerman used the verb "jawbone" to describe his efforts to have the card returned, which included telling the e-Smart representatives that searches would be performed. See Dictionary.com, http://dictionary.reference.com/browse/jawbone (defining the informal use of jawbone as "to attempt to influence or pressure by persuasion rather than by the exertion of force or one's authority, as in urging voluntary compliance with economic guidelines") (last accessed May 12, 2011). Because Magistrate Judge Zimmerman did not clearly order the card returned the day of the settlement conference, Grace's refusal to return the card at the settlement conference cannot amount to civil contempt.

On the day after the settlement conference, however, Magistrate Judge Zimmerman issued a clear, unequivocal, and specific order to the e-Smart representatives. The sealed Order stated:

> **IT IS HEREBY ORDERED** that everyone who participated in yesterday's settlement conference shall make every effort to locate the missing smart card (with a picture of George Washington on it) and return it to the Court. It may be returned anonymously by sending it to [chambers]. . . . Counsel for plaintiff is **ORDERED** to serve a copy of this Order on every one of plaintiff's representatives and to file a declaration of service. If the card is not returned by **August 20, 2010**, I will turn the matter over to the FBI to investigate or certify the facts to Judge Patel to determine if there has been spoliation of evidence.

(Docket No. 324.) Grace does not deny receiving notice of this order and, other than denying that she originally stole the Fidelica card, Grace does not defend on the grounds that she

could not comply with Magistrate Judge Zimmerman's Order.[9] Accordingly, after stealing the e-Smart card during the settlement conference, Grace was in contempt of court when she failed to return it by August 20, 2010, in violation of the August 13, 2010, Order.

C. Determination of the Appropriate Remedy

As the adjudication of civil contempt concludes the need for Magistrate Judge Zimmerman to serve as a witness to the events at the settlement conference on August 12, 2010, the conflict resulting from Judge Patel or another judge in the Northern District presiding over the civil contempt hearing no longer exists. Accordingly, the court will defer to Judge Patel to determine whether the appropriate remedy is dismissal with prejudice, as suggested in the Order to Show Cause, or some lesser sanction, such as one of the alternatives the Special Prosecutor suggested in his memorandum of April 20, 2011. (See

[9] It could be hypothesized that Grace was unable to return the card because she had destroyed or discarded it. See generally United States v. Rylander, 460 U.S. 752, 757 (1983) ("In a civil contempt proceeding . . . , a defendant may assert a *present* inability to comply with the order in question. . . . It is settled, however, that in raising this defense, the defendant has a burden of production."). But see Falstaff Brewing Corp. v. Miller Brewing Co., 702 F.2d 770, 782 n.7 (9th Cir. 1983) ("This court, in dicta, has asserted that self-induced inability [to comply] is not a defense to a charge of compensatory civil contempt.") (citing United States v. Asay, 614 F.2d 655, 660 (9th Cir. 1980)). Even assuming inability to comply could serve as a defense in this case, none of the evidence before the court suggests that Grace would have discarded or destroyed the card before Magistrate Judge Zimmerman issued his Order. To the contrary, the court finds it highly probable that, after successfully stealing what she believed belonged to her, Grace would have held on to the card. Moreover, even if Grace discarded the card, the Order--issued less than twenty-four hours after she could have discarded it--unequivocally ordered her to "make every effort to locate the missing card." (Docket No. 324.)

Docket No. 363 (suggesting that appropriate remedies could be ordering "reimbursement of Defendants['] costs associated with retaining and preparing [an] expert" to testify about the technology on the Fidelica card, "a preclusion order, a shift of the burdens of production and/or persuasion, or an order requiring payment for Defendants' costs to locate and subpoena production of a replacement Fidelica card").)

NOW, THEREFORE plaintiff e-Smart Technologies, Inc., is hereby adjudged in civil contempt of the court's Order of August 13, 2010. (Docket No. 324.) This matter is hereby referred back to Judge Patel for all further proceedings, including determination of the appropriate remedy to enforce this Order.

IT IS SO ORDERED.

DATED: May 18, 2011

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE